PUBLISHED

UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

PAUL MAZZELL,
Petitioner-Appellee,

v.

PARKER EVATT, Commissioner,

South Carolina Department of
Corrections; TRAVIS MEDLOCK,
Attorney General, State of South
Carolina,
Respondents-Appellants.

No. 95-6996

Appeal from the United States District Court
for the District of South Carolina, at Columbia.
Dennis W. Shedd, District Judge.
(CA-90-2651-3-19BC)

Argued: May 10, 1996

Decided: July 1, 1996

Before WILKINSON, Chief Judge, and HALL and ERVIN,
Circuit Judges.

_____

Reversed and remanded by published opinion. Chief Judge Wilkinson
wrote the opinion, in which Judge Hall and Judge Ervin joined.

_____

COUNSEL

ARGUED: Donald John Zelenka, Assistant Deputy Attorney Gen-
eral, Columbia, South Carolina, for Apellants. John Henry Blume, III,
Columbia, South Carolina, for Appellee.

**OPINION**

WILKINSON, Chief Judge:

A South Carolina jury convicted Paul Mazzell in 1983 of criminal conspiracy, conspiracy to kidnap, murder, and kidnapping. He was sentenced to life in prison. After his conviction was affirmed on direct appeal and his request for state post-conviction relief was denied, Mazzell petitioned for a writ of habeas corpus. He contended, inter alia, that his trial counsel was ineffective under the Sixth Amendment because he failed to object to allegedly erroneous jury instructions. The district court granted the writ, and the state of South Carolina now appeals. Because we find that Mazzell's attorney was not constitutionally ineffective, we reverse the judgment of the district court.

I.

Paul Mazzell and a co-defendant, Edward Merriman, were convicted in 1983 for crimes arising from the abduction and murder of Ricky Seagraves. Seagraves had been abducted and murdered near Charleston, South Carolina in October of 1978. The police did not recover his body until 1981, however, when one Danny Hogg led them to it. Hogg admitted that he participated in Seagraves' abduction, and he implicated Mazzell and Merriman in the crime as well. In exchange for immunity from prosecution, Hogg agreed to testify against Mazzell and Merriman. Mazzell was thereafter charged with criminal conspiracy, conspiracy to kidnap, murder, and kidnapping.

At trial, the state and defense differed sharply over the events that led to Seagraves' murder. According to the state, the victim (Seagraves) and the perpetrators (Mazzell, Hogg, and Merriman) were all connected to the Charleston drug trade; Hogg and Merriman reportedly worked for Mazzell. The state's theory of the case was that Mazzell wanted Seagraves killed; he instructed Hogg and Merriman to abduct and deliver Seagraves to him, and he then killed Seagraves.

In support of its theory, the state presented a number of witnesses. These witnesses testified that in late 1978 friction mounted between Seagraves and Mazzell. One witness testified to having been seized

2

from his job site by Mazzell, Hogg, and Merriman, then forced into a car and questioned about Seagraves' whereabouts; Mazzell informed this witness that he "would never have to worry about Ricky [Seagraves] anymore." Another witness reported being asked by Mazzell, through Danny Hogg, to kill Seagraves in exchange for drugs.

Hogg testified that Mazzell was so angry with Ricky Seagraves that he put out a contract on Seagraves' life in late 1978. According to Hogg, on the evening of October 30, 1978, Mazzell summoned him and Merriman and instructed them to "Go get Ricky. Bring him to me. I'm going to kill him." Hogg and Merriman located Seagraves at a convenience store, the Majik Market, near Charleston. Witnesses at the market testified that Hogg or Merriman fired shots, chased Seagraves into the store, beat him, dragged him back to the truck, and sped off. Then, according to Hogg, they delivered Seagraves to Mazzell, who killed and buried Seagraves out of their presence. Two other witnesses corroborated Hogg's version of these events. Carl Hines testified that Mazzell declared in late 1978 that he intended to kill Seagraves, and Mazzell later boasted that he had indeed killed him. And Harold Behrens testified that Merriman recounted the abduction and murder to him, giving a description that was consistent with Hogg's testimony.

Mazzell presented a vigorous defense. His lawyer attacked the credibility of most of the state's witnesses. He brought out the past criminal activity of Hines and Behrens and he noted that numerous prosecution witnesses had received special treatment from the state. Mazzell's attorney particularly assailed Danny Hogg's credibility. He presented witnesses who testified that Hogg and Mazzell had a falling out, and that Hogg had said he would get back at Mazzell by killing him, or by putting him in jail for a long time. Two defense witnesses specifically claimed that Hogg admitted to them that he, not Mazzell, shot Seagraves. In his closing argument, Mazzell's attorney argued that Hogg killed Seagraves by shooting him at the Majik Market.

Mazzell did not take the stand, but his wife, Colleen, testified that her husband was home watching television with her the entire evening of the abduction and murder. In fact, she stated that Hogg visited the Mazzells that very evening and announced that he was going to find Seagraves. According to Colleen, Paul Mazzell responded by warning

3

Hogg to stay away from Seagraves. Her husband, she testified, was very close to Seagraves.

At the close of evidence, the judge charged the jury. The judge's instructions included discussion of the four crimes that Mazzell was accused of, the alibi defense that he raised (through his wife's testimony) at trial, and the principles of co-conspirator and accomplice liability. Spanning thirty transcript pages, the instructions were lengthy and elaborate. It is alleged errors in these instructions that form the basis of Mazzell's ineffectiveness claim.

Following deliberations, the jury convicted Mazzell of both conspiracy counts and murder and kidnapping. Although the state sought the death penalty, the jury recommended life in prison. On direct appeal, Mazzell raised numerous assignments of error, but the South Carolina Court of Appeals affirmed his conviction. State v. Merriman, 337 S.E.2d 218 (S.C. App. 1985). The South Carolina Supreme Court declined to review Mazzell's conviction.

Mazzell then sought state post-conviction relief. In his application, he raised a number of claims, including the one now before this court. Specifically, he argued that the trial judge's jury instructions were contrary to South Carolina law because they permitted the jury to convict Mazzell as a principal in the crimes of murder and kidnapping even if the jury was not convinced that he was present at the scene of the crime. Mazzell asserted that his attorney's failure to object to the instructions constituted ineffective assistance of counsel. The state post-conviction court, however, rejected this claim.

Mazzell thereafter sought federal habeas relief. He asserted, inter alia, that his counsel was ineffective for failing to object to the disputed jury instructions. A federal magistrate recommended that Mazzell's petition be denied. The district court, however, granted the writ, finding that Mazzell's trial counsel was ineffective. The court reserved judgment on the other issues raised in Mazzell's petition. The state of South Carolina now appeals.

II.

The components of an ineffective assistance of counsel claim are by now well-established. Under the test set forth by the Supreme

4

Court in Strickland v. Washington, 466 U.S. 668 (1984), a defendant must show that his counsel's performance "fell below an objective standard of reasonableness" and that "the deficient performance prejudiced the defense." Id. at 687-88. In addressing Mazzell's claim, we bear in mind that "[t]he benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Id. at 686.

A.

Mazzell first contends that his attorney failed the performance prong of Strickland because he did not object to jury instructions that allegedly misstated South Carolina law. After reviewing the pertinent state law, the instructions in their entirety, and the trial itself, we conclude that Mazzell's trial counsel did not render deficient performance by failing to object to the trial judge's instructions.

Review of Mazzell's argument requires an examination of South Carolina criminal law. South Carolina continues to recognize the common law distinction between an accessory before the fact and a principal. State v. Collins, 225 S.E.2d 189, 192 (S.C. 1976); State v. Brazzell, 74 S.E.2d 573 (S.C. 1953); State v. Sheriff, 110 S.E. 807 (S.C. 1922). A principal must be actually or constructively present at the scene of the crime, while an accessory before the fact cannot be present at the scene. State v. Prince, 447 S.E.2d 177, 181 (S.C. 1993) (accessory before the fact urged another to commit crime but was not present when the offense was committed); State v. Chavis, 290 S.E.2d 412 (S.C. 1982) ("[g]uilt as a principal is established by presence at the scene as a result of prearrangement to aid, encourage, or abet in the perpetration of a crime."); State v. Gilbert, 93 S.E. 125 (S.C. 1917) (same). A defendant in South Carolina cannot be convicted as a principal if the evidence could support conviction only as an accessory before the fact. Collins, 225 S.E.2d at 192; Sheriff, 110 S.E. 807; see also State v. Good, 432 S.E.2d 463, 465-66 (S.C. 1993). Hence, in a limited class of cases, a defendant indicted and tried as a principal may be entitled to a jury instruction regarding the distinction between an accessory and a principal. Good, 432 S.E.2d at 465-66; Collins, 225 S.E.2d at 192. A jury finding that such a defendant acted only as

5

an accessory "is the equivalent to a finding of not guilty." <u>Good</u>, 432 S.E.2d at 465.

Under these principles, according to Mazzell, his attorney should have objected to the jury instructions given in his case. Mazzell was charged as a principal to the crimes of murder and kidnapping. The state acknowledged in oral argument before this court that the presence requirement applies to these two crimes. Mazzell points to the judge's instruction that:

> If one combines with others to accomplish an illegal purpose, he is liable criminally for everything that is done by his confederates incidental to the execution of the common design as one of its probable and natural consequences. <u>This is true though the defendant was not present when the act was committed</u>. (Emphasis added).

This instruction, Mazzell asserts, misstated the elements of murder and kidnapping under state law. This was reinforced, he claims, by the judge's instructions on the murder count. Those instructions, he notes, did not inform the jury that Mazzell had to be present at the crime scene, but rather asked the jury to determine whether "his act or his acts <u>in concert with the acts of others</u> can be said to be the cause of death." (Emphasis added).

We are not persuaded that the failure to object to these instructions was "outside the wide range of professionally competent assistance." <u>Strickland</u>, 466 U.S. at 690. Our conclusion is informed by a basic maxim: an allegedly erroneous "instruction `may not be judged in artificial isolation,' but must be considered in the context of the instructions as a whole and the trial record." <u>Estelle v. McGuire</u>, 502 U.S. 62, 72 (1991) (quoting <u>Cupp v. Naughten</u>, 414 U.S. 141, 147 (1973)); <u>see also Gore v. Leeke</u>, 605 F.2d 741 (4th Cir. 1979), <u>cert. denied</u>, 444 U.S. 1087 (1980).

We note first that it is far from clear that the jurors would have understood the disputed instruction to apply to the substantive counts of murder and kidnapping, instead of the two conspiracy counts with which Mazzell was charged. Under South Carolina law, of course, a conspirator can be liable for the acts of co-conspirators even if he is

6

not present when those acts are committed. State v. Adams, 462 S.E.2d 308, 309 (S.C. App. 1995). The one sentence of the instruction that Mazzell most vigorously contests was immediately followed by a discussion relevant to conspiracy:

> This rule of criminal responsibility for the acts of others is subject to the reasonable limitation that the particular act must be shown to have been done in furtherance . . . of the common object and design for which the parties were combined; but, if one of a number of conspirators commit a fresh and independent act, wholly outside and foreign to the common design, the others are not held equally guilty of the act.

Even if we assume the jurors understood the disputed instructions to be relevant to the crimes of murder and kidnapping, however, we would still reject Mazzell's claim of deficient performance. The judge's instructions occupied thirty transcript pages, and accurately described the elements of four separate crimes with respect to two defendants. Viewing the jury instructions in their entirety demonstrates that Mazzell's attorney did not render deficient performance. The instructions included repeated and accurate statements of the applicable law. In the paragraph immediately preceding the challenged instruction, for instance, the judge explained to the jury that:

> [I]f a crime is committed by two or more persons who are acting together in the commission of an offense, the act of one is the act of both or all, if there are more than two. Two people can be guilty of killing another, of murder, when only one of the two had a pistol and only one shot, if both are together, acting together, assisting each other in the commission of the offense. The law says, under those circumstances, the act of one is the act of all, the hand of one is the hand of all. (Emphasis added).

This description of the parties who can be held responsible for murder conveys that they must be present when the crime is committed.

In addition, the judge explicitly instructed the jury that the state had to prove that Mazzell was present at the scene of the crime. Early in

7

his charge to the jury, the judge explained that Mazzell had pled the defense of alibi, and he thereafter noted that this did not relieve the state of its burdens:

> Now the defendant, Mr. Mazzell, has pled in this case what we call the defense of alibi. That means he was not at the scene of the crime at the time it was committed, but that he was elsewhere and had nothing to do with it. Now the Defendant Mazzell does not have to prove that he was not at the scene of the crime. <u>The burden is on the State of South Carolina to prove that he was actually present and that he actually participated in it, and that he was not elsewhere</u>. (Emphasis added).

Aside from this alibi instruction, the presence requirement was noted yet again just following the disputed instruction. Clarifying that presence was a necessary, but not sufficient requirement for conviction, the judge stated:

> [M]ere presence at the scene of a crime and knowledge that a crime is being committed are not sufficient to make a defendant [a] participant in a crime. <u>The State would have to prove beyond a reasonable doubt that the defendant was present and aided or abetted or assisted or participated in the commission of the crime and was not just simply present while a crime was being committed and had knowledge that a crime was being committed</u>. (Emphasis added).

In short, examining the instructions in their entirety reveals that they adequately conveyed the applicable law.

Mazzell contends that his attorney should have insured that the instructions properly clarified the difference in South Carolina law between a principal and an accessory before the fact. We disagree. The attorney's behavior is reasonable when viewed in light of the approach taken by the defense at trial. Mazzell's attorney adopted a two-pronged strategy at trial: he attacked the government's case and he offered an alibi. More than an alibi, in fact, Colleen Mazzell testified that her husband warned Hogg to stay away from Seagraves. Not a single aspect of this defense ever suggested that Mazzell was an

8

accessory instead of a principal. To imply that Mazzell might be an accessory instead of a principal, and seek jury instructions to that effect, was plainly in conflict with the approach taken by trial counsel.

In attacking the trial attorney's failure to obtain proper clarification of South Carolina law, Mazzell relies chiefly on State v. Collins, 225 S.E.2d 189 (S.C. 1976). That case, however, presented quite different circumstances. In Collins, the evidence "created a close question as to whether [the defendant] might more properly have been charged as an accessory than as a principal," id. at 192, because the defendant, though apparently involved with the robbery, was in jail at the time it actually occurred. Where, as here, the defendant contends that he had no involvement with the crime whatsoever, an instruction clarifying the difference between a principal and accessory is not required. In fact, the South Carolina Supreme Court expressly rejected the need for any clarifying instruction on the difference between an accessory and a principal in a case where two brothers accused of killing their father and grandmother each asserted their non-involvement with the crime. State v. Good, 432 S.E.2d 463, 465-66 (S.C. 1993). Mazzell's assertion of non-involvement places him squarely within the Good decision.

Finding Mazzell's counsel to be deficient would require us to adopt a standard of ineffectiveness that would sweep many able and competent lawyers within its reach. Mazzell's trial attorney presented a vigorous and capable defense. He sought to emphasize Mazzell's innocence and he vigorously impeached those witnesses who claimed Mazzell was involved in Seagraves' murder. At the conclusion of trial, he sought instructions consistent with that defense. The instructions accurately conveyed to the jury the elements of the respective offenses and, taken as a whole, they accurately stated the applicable South Carolina law. The choices Mazzell's counsel made were well within "the wide range of reasonable professional assistance." Strickland, 466 U.S. at 689. We decline to allow an ineffective assistance of counsel claim to create a situation where post-conviction attorneys stroll in with the full benefit of hindsight to second-guess trial lawyers who professionally discharge their duties to their clients under the manifold pressures of a state trial. See id. at 690; Kimmelman v. Morrison, 477 U.S. 365, 384 (1986); Bunch v.

9

Thompson, 949 F.2d 1354, 1363 (4th Cir. 1991), cert. denied, 505 U.S. 1230 (1992).

B.

Even if our conclusion on the performance prong were to the contrary, Mazzell's claim would still fail because no prejudice flowed from the lack of an objection to the jury instructions. Under the prejudice prong of Strickland, Mazzell must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. at 694; Nix v. Whiteside, 475 U.S. 157, 175 (1986). As the state post-conviction court found, this is a burden he cannot meet.

Mazzell argues that he was prejudiced because there was a "reasonable probability" that the jury believed that he helped plan Seagraves' murder, but that he did not shoot Seagraves himself. This was a plausible scenario, according to Mazzell, because the state presented only weak evidence that he actually shot Seagraves. If the jury believed this version of events, Mazzell argues that he could not lawfully be convicted of murder and kidnapping, yet the instructions erroneously allowed the jury to convict him as a principal to those crimes.

This argument requires us to ignore the trial record. At trial, the jury was presented with competing theories of the abduction and murder of Ricky Seagraves. According to the theory presented by the state, Mazzell wanted Seagraves killed and he enlisted Hogg and Merriman to find Seagraves for him; Hogg and Merriman found Seagraves at the Majik Market, roughed him up, delivered him to Mazzell, and Mazzell killed and buried him. In contrast to the state's version of events, Mazzell's theory was that he had absolutely nothing to do with Seagraves' murder; in fact, he tried to protect Seagraves, who was his close friend, by warning Hogg to stay away from him. Under Mazzell's theory, Danny Hogg killed Seagraves himself, and then blamed Mazzell.

It is in light of these theories and the evidence presented to support them that we must gauge the effect of the jury instructions. Estelle, 502 U.S. at 72. As our review of the trial record reveals, the supposedly plausible scenario that Mazzell now presents was not a question

10

put to the jury: the defense did not argue, or even hint, that Mazzell was involved only before the fact, but was not present at the crime scene. As the state post-conviction judge noted:"The evidence presented at trial did not create sufficient question as to whether Mazzell might more properly have been charged as an accessory before the fact than as a principal. . . . There was no evidence presented to support Mazzell's new post-conviction assertion that he acted only as an accessory before the fact." Instead, the evidence put a different question to the jury: whether Mazzell participated in Seagraves' murder by instructing that he be abducted and thereafter killing him. It is on this question that the state and defense clashed, and which the jury was asked to decide. Asked to choose between contrasting theories of what happened on the night of October 30, 1978, the jury's verdict indicates that it believed that Mazzell killed Seagraves after Hogg and Merriman abducted him.

This understanding of the jury's verdict is reinforced by its verdicts on the other counts. In addition to murder, Mazzell was convicted of conspiracy to kidnap, criminal conspiracy, and kidnapping. These convictions reveal that the jury generally believed the state's theory of the case, and did not credit Mazzell's defense. If Mazzell's defense was believed, he would not have been convicted of either conspiracy count because he (through his wife) claimed that he was totally uninvolved in the crime.

Moreover, in order to convict Mazzell of kidnapping, the jury had to have concluded that Mazzell was an active participant in the abduction. The kidnapping instruction stated:

> In South Carolina, anyone who shall unlawfully seize, confine, kidnap, abduct, or carry away any other person by any means whatsoever, without authority of the law, is guilty of the crime of kidnapping. . . . [T]he State must prove beyond reasonable doubt that there was [ ] an intentional [ ] seizure, detention, confinement or carrying away of another person without the consent of that person, and that it was done [ ] without authority of law.

To convict based on this instruction, the jury must have found that Seagraves was alive when Hogg and Merriman delivered him to Maz-

11

zell; otherwise, Mazzell could not have taken Seagraves "without [his] consent." The conviction on kidnapping further reveals that the jury found Mazzell to be an active and present participant (who seized, detained, confined or carried away Seagraves) in the kidnapping. In short, the jury verdict on kidnapping is telling: it indicates that the jury did <u>not</u> discount the testimony of the state witnesses based on Mazzell's attacks on them, did <u>not</u> credit Colleen Mazzell's claim that her husband had no involvement in this crime, and did <u>not</u> believe the defense witnesses who claimed that Hogg (not Mazzell) killed Seagraves by shooting him at the Majik Market.

Finally, we reject Mazzell's attempt to characterize the state's case as particularly weak with respect to his presence at the crime scene. Danny Hogg, of course, testified in detail as to Mazzell's involvement in the abduction and murder. But Hogg was not the only witness whose testimony supported the state's theory of the case. Carl Hines testified that in late 1978 Mazzell declared he was going to kill Seagraves and that Mazzell later boasted of killing him, describing how Seagraves had begged for his life. As Hines recounted their conversation, Mazzell said: "[t]hat son of a bitch[Seagraves] wasn't so tough. . . . That son of a bitch wasn't so mean. Not at the end. . . . He was just like all the rest of the son of a bitches. . . . I had him down on his knees. He was crying and begging and he said,`Paul, Paul, please don't kill me.'" According to Hines, Mazzell was confident that he could not be charged with murder because the police would not be able to find Seagraves' body. As Hines reported it, Mazzell said: "They can't file no charges on you if they can't find the body. . . . They'll have to go a long ways out to find that son of a bitch." And aside from Hines, Harold Behrens also corroborated Hogg's testimony. Behrens recounted his own conversation with Merriman, Mazzell's co-defendant, about the abduction and murder. The version of events Merriman described to Behrens was consistent with the state's theory of the case.

In the face of this evidence, Mazzell now attempts to characterize Hogg, Hines, and Behrens as highly untrustworthy witnesses. But Mazzell's trial counsel presented this very same argument to the jury. Indeed, attacking the credibility of the state's witnesses, particularly Hogg, formed one of the cornerstones of Mazzell's defense at trial. The question of credibility was thus put before the jury, and "our

12

adversary system reposes judgment of the credibility of all witnesses in the jury." Brooks v. Tennessee, 406 U.S. 605, 611 (1972). We shall uphold its verdict.

III.

For the foregoing reasons, we reject Mazzell's claim that his trial counsel was constitutionally ineffective. The judgment of the district court is hereby reversed and the case is remanded for further proceedings consistent with this opinion.

SO ORDERED

13